# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　v.　　　　　　　　　　)　　　02: 04cr0313
　　　　　　　　　　　　　　　　　　)
GREGORY ARMSTRONG　　　　　　　　)

## MEMORANDUM OPINION AND ORDER OF COURT

February 8, 2006

　　　　　　Defendant, Gregory Armstrong, and his co-defendant, James Jones, were indicted by a Grand Jury on December 14, 2004, and each charged with one count of conspiracy to distribute and possess with intent to distribute five (5) kilograms or more of cocaine from on or about December 3, 2004 to December 6, 2004, in violation of Title 21, United States Code, section 846; and one count of attempt to possess with intent to distribute five (5) kilograms or more of cocaine on or about December 6, 2004, in violation of Title 21, United States Code, section 846.   Co-Defendant James Jones was also charged in a separate count with possession with intent to distribute less than 500 grams of cocaine on or about December 6, 2004, in violation of Title 21, United States Code, sections 841(a)(1) and 841(b)(1)(C).

　　　　　　On August 12, 2005, James Jones pleaded guilty to Count Two of the Indictment which charged him with attempt to possess with intent to distribute five (5) kilograms or more of cocaine on or about December 6, 2004, in violation of Title 21, United States Code, section 846.

　　　　　　On October 13 and 14, 2005, the Court held a non-jury trial on the pending charges against Defendant Gregory Armstrong ("Armstrong").  The government presented seven witnesses:  Agent Brenda Sawyer of the Pennsylvania Attorney General's Office; Larry Wallace; Inspector Joseph Bellissimo of the United States Postal Service; Narcotics Detective

Timothy Hanna and Captain Bryan Washowich, both of the City of McKeesport Police Department; Commander David Lieberum of the Pennsylvania State Police; and United States Probation Officer Donald Covington.

Armstrong presented two witnesses:  Shanise Hanlin, his sister, and Sharise Truesdale.

At the non-jury trial, both parties were represented by counsel who presented and argued the issues skillfully and effectively.  The testimony from the non-jury trial has been transcribed and filed and the parties have each filed Proposed Findings of Fact and Conclusions of Law.

The issues have been fully briefed, and the matter is ripe for disposition.    The Court therefore enters its decision pursuant to Federal Rule of Criminal Procedure 23(c).  For the reasons that follow, the Court finds that defendant Gregory Armstrong is guilty as charged in the Indictment of the crimes of conspiracy to distribute and possess with intent to distribute five (5) kilograms or more of cocaine, in violation of Title 21, United States Code, section 846; and attempt to possess with intent to distribute five (5) kilograms or more of cocaine, in violation of Title 21, United States Code, section 846.

## FINDINGS OF FACT

The evidence presented at trial establishes the following:

A.       The Two "Suspect" Packages

On Friday, December 3, 2004, Agent Brenda Sawyer of the Pennsylvania Attorney General's Office was contacted by her supervisor, Francis Speranza, who told her that a suspect package was being sent from San Diego, California, to 1716 Sumac Street,  McKeesport,

Pennsylvania and was scheduled to be delivered on December 4, 2004.[1]  She then drove by 1716 Sumac Street and noticed a "for sale" sign in the yard.  Next, Agent Sawyer contacted Trooper David Lieberum, who she knew lived across the street from 1716 Sumac Street, and engaged him in the investigation.  Trooper Lieberum informed Agent Sawyer that 1716 Sumac Street was unoccupied and that the last resident of 1716 Sumac was Alice Nilson, who was then residing in a nursing home.

The sender of the package was listed as "Martha Bryant, 5958 49th Street #2, San Diego, CA 92105."  Agent Sawyer testified that the sender's address was queried through internet mapping databases, as well as discussed by her Supervisor with both postal and DEA authorities in San Diego, and could not be verified as a true address.  Additionally, the telephone number provided for the sender rang to a fax machine.

On Saturday, December 4, the date of the intended delivery of the package, Agent Sawyer made arrangements to view the suspect package at the Federal Express facility in Plum Borough.  She observed that the package was large and the intended recipient was listed as "Daniel Albright, 1716 Sumac Street, McKeesport, PA 15132."  *See* Govt Ex. 9.

While at the Federal Express facility, Agent Sawyer became aware of a second package which looked almost identical to the first package:  the two boxes were the same size, contained the same grease pencil markings, both originated from San Diego, and both were being shipped to McKeesport, although to different locations.  The intended recipient on the second package was listed as "Sonia Jones, 1315 Maple Street, McKeesport, PA."  (Tr. at 12.)

---

[1]      Agent Sawyer testified that Francis Speranza had been contacted by an agent of the Drug Enforcement Agency in San Diego.

The sender on the second package was listed as "Monica Reed, 240 Vista Horizon St., San Diego, CA 92113."

A query to local police indicated that the last known occupant at 1315 Maple Street was Sharese Truesdale, who was known to have children with Armstrong. However, Agent Sawyer did not believe that Ms. Truesdale still resided at 1315 Maple as she had seen her moving into a new location at 1304 Sumac Street.

Agent Sawyer seized the two packages from the Federal Express facility and transported them to the Attorney General's narcotics facility in North Huntington, PA, and subjected the boxes to a canine sniff. After the canine alerted to both packages, search warrants were obtained and both boxes were opened.

In the package addressed to 1716 Sumac Street ("Package 1"), the police found five (5) large Doritos bags, each containing four (4) smaller Doritos bags which contained a white powder substance, appearing to be cocaine. All the Doritos bags were heat-sealed. The second package addressed to 1315 Maple Street ("Package 2") was identically packaged, but it contained six (6) large Doritos bags, one more than found in Package 1. A field test confirmed that the white powder substance was in fact cocaine. Further laboratory testing revealed that Package 1, addressed to 1716 Sumac, contained 4.9 kilograms of cocaine hydrochloride, a Schedule II controlled substance, with a purity concentration of 82%. Package 2, addressed to 1315 Maple, contained 5.962 kilograms of cocaine hydrochloride, a Schedule II controlled substance, with a purity concentration of 87%. (Transcript at 29-30.)

B.        The Controlled Delivery and Subsequent Arrest of James Jones and Gregory
          Armstrong

The next day, Sunday, December 5, 2004, Agent Sawyer and her Supervisor met

with Trooper David Lieberum, who lived across the street from 1716 Sumac.  Trooper

Lieberum loaned his Chevy pickup truck to the investigators and allowed them access to his

home for purposes of surveillance.

United States Postal Inspector Joseph Bellissimo testified that on the morning of

December 6, 2004, he received a phone call from officers with the Pennsylvania Attorney

General's office asking for his assistance to "wire up" a suspected package.

He personally prepared Package 1 for a controlled delivery to 1716 Sumac Street in

McKeesport.  The cocaine was removed from the box, stored in the police evidence room, and

replaced with Bisquick.  Postal Inspector Joseph Bellissimo concealed a monitoring device

inside Package 1.  The device was stored inside the package so that it would alert when an

extremely thin wire, "thinner than a strand of hair," was broken.

Meanwhile, Agent Sawyer and McKeesport Police Captain Bryan Washowich

arrived at Trooper Lieberum's house at approximately 10:30 a.m.   Inspector Bellissimo went

with officers from the Drug Task Force to assist in the surveillance.  He was stationed about

two (2) blocks away from Sumac Street.

At approximately 10:45 a.m., an undercover agent with the Pennsylvania State

Police, dressed as a Federal Express employee, placed Package 1 on the front porch of 1716

Sumac Street, near a rocker.  A note on the porch directed to "Please Place Package Behind

Side of Rocker." (Govt. Ex. 5A.). The package was clearly visible from the street. Agent

Sawyer was in constant radio contact with other police officers who were stationed in the area.[2]

Approximately fifteen (15) minutes later, close to 11:00 A.M., Agent Sawyer saw

Armstrong driving a Black Ford F-150 truck along Sumac Street and peering over his right

shoulder appearing to look at the porch of 1716 Sumac. Agent Sawyer testified that Armstrong

looked at the porch for a "few seconds" as he was slowing down because there is a stop sign

near the house.

Captain Washowich also testified that he observed, in the minutes following the

controlled delivery of the package, a black Ford F-150 truck drive to the area and "noticed the

driver of the vehicle looking over to the package, bending his head to where he would have to

focus on that porch." (Tr. at 149.) "I saw him look over his right-hand shoulder . . . and make

eye-contact with 1716 Sumac or in that specific location." (Tr. at 150.) Captain Washowich

testified that Armstrong was driving "fairly slow," and that he was able to identify Armstrong

as the driver by sight. (*Id.* at 149.)

Armstrong had a passenger with him in the truck, but neither Agent Sawyer nor

Captain Washowish was able to identify the passenger. However, surveillance agents, who

were simultaneously broadcasting their observations, later identified the passenger as James

Jones.

---

[2]    The operation included seventeen (17) law enforcement officers who were
surveilling the area and transmitting their observations via radio.

Armstrong turned right at the intersection of Sumac and Beaver Avenue, and shortly thereafter arrived at the front of his house at 3010 Grover Avenue.[3]  Armstrong's back yard is less than 100 yards from 1716 Sumac.

Five to six minutes after Armstrong drove past 1716 Sumac, both Agent Sawyer and Captain Washowich testified that they saw Cora Ashley, a cousin to Armstrong and the sister of James Jones, leave her house at 1717 Sumac, walk across the street, and stand on the sidewalk in front of the house located at 1716 Sumac.  Moments later, James Jones driving a Honda automobile alone, pulled up in front of 1716 Sumac.  He briefly spoke with Cora Ashley, then exited from the Honda, walked onto the porch and retrieved the package, placed the package on the right front passenger seat of the Honda, walked back around the rear of the car, and got into the driver's seat and drove off.  Jones made a right onto Beaver Avenue.  Cora Ashley then walked back into her own home at 1717 Sumac.

Within minutes, a radio call directed agents to move in because the package alerted that it had been opened.  Inspector Bellissimo testified that the package went into alert mode at approximately 11:11 A.M.  When the alert sounded, Inspector Bellissimo, accompanied by Narcotic Detective Timothy Hanna, drove down an alley behind Armstrong's house and saw Jones walking away from the Honda.  Jones would not have been able to hear the alert beeper. Inspector Bellissimo did not know where the package was located, but from the surveillance, the officers believed the package was in the car.

---

[3]        Armstrong resided at 3010 Grover with Lashalle Griffin and their children.

James Jones was arrested approximately six (6) feet from the Honda, walking up the alley away from Armstrong's house and toward Cora Ashley's house on Sumac Street. The Honda was parked on Irwin Alley, an alley which is directly behind Armstrong's residence, and clearly visible from Armstrong's house. The Honda was parked with the trunk in front of the garage attached to 3010 Grover Avenue, facing up the alley toward Sumac Street.

When Agent Sawyer arrived at the scene, Jones was being taken into custody. She asked him where the package was, but he did not respond. At the time of his arrest, no one knew where the package was. After both Jones and Armstrong were arrested, officers searched the Honda and located Package 1 in the locked trunk of the car.[4] There is no surveillance report of when the package was opened by Jones.

Agent Sawyer then walked around to the front of 3010 Grover and saw Armstrong on the sidewalk not far from the truck that she had seen him driving earlier. Agent Sawyer gave the directive to Officer Timothy Hanna, a narcotics detective with the City of McKeesport Police Department, to arrest Armstrong. At the time of his arrest, Armstrong asked Agent Sawyer if he could give the money that he had on his person to his "wife," Lachelle Griffin, who was present.[5] Agent Sawyer denied the request. Officer Hanna testified that Armstrong was cooperative during the arrest. Armstrong had $2,239 cash on his person at the time of his arrest.

---

[4]    Agent Sawyer testified that no one saw Jones open the package nor did anyone see him move the package from the front passenger seat to the trunk.

[5]    On cross examination, Agent Sawyer testified that she grew up in McKeesport and knew the families of James Jones and Gregory Armstrong. Cora Ashley was a friend of hers; while she knew Armstrong personally, she did not consider him a friend.

Cell phones were seized from both Armstrong and Jones.  The Ford F-150 truck that Armstrong had been seen driving was later determined to be registered to Cora Ashley.

C.        Conversation Between Trooper David Lieberum and Gregory Armstrong

Trooper David Lieberum, with the Pennsylvania State police, testified that he has owned a house located at 1719 Sumac Street since 1975.   Alice Nilson, the owner of 1716 Sumac, was his elderly neighbor  and because she had "no family," the Lieberums cared for her.

 In May 2004, Ms. Nilson vacated her property and moved into a personal care facility. [6] Trooper Lieberum assisted in the process of liquidating the assets of  Ms. Nilson when she moved to the personal care home.

On September 4, 2004, Trooper Lieberum and his wife had a yard sale at Ms. Nilson's home in an attempt rid Ms. Nilson's home of her personal items.  On that date, Armstrong went through the Nilson home with a "handiman" and made mention of purchasing the home.  He wrote his name and telephone number on the back of a yard sale flyer and left that information with Trooper Lieberum's wife.   The following week, Trooper Lieberum had a discussion with Armstrong regarding the purchase of Ms. Nilson's home.

Armstrong told him that he purchased and renovated homes.  Trooper Lieberum informed Armstrong that the asking price for the house was $35,000;  Armstrong countered with an offer of $25,000, made specific reference to having gone through the home, and was clearly aware that the house was vacant.   Trooper Lieberum rejected Armstrong's offer.

---

[6]        Trooper Lieberum testified that Alice Nilson died three weeks prior to the instant trial.

Armstrong also told Trooper Lieberum that he had recently purchased 1717 Sumac, the house next door to Trooper Lieberum's home, for $30,000.   Lieberum contacted the former owners of 1717 Sumac who confirmed that they had sold their home to Armstrong for $30,000. However, the Allegheny County website of  real estate records reflects that 1717 Sumac was purchased by Michael Armstrong for $11,000.

Trooper Lieberum testified that either he or his wife were in daily contact with Ms. Nilson once she vacated 1716 Sumac Street and they would have known if she was expecting a package from San Diego, CA.   She never told them that she was expecting such a package.


D.        Armstrong  Travels to California Twice in November 2004

It is undisputed that Armstrong was in San Diego from November 18, 2004 until November 24, 2004; and again from November 30, 2004 until December 3, 2004.

Further, it is undisputed that James Jones was in San Diego from November 21, 2004 until November 24, 2004.

Sharese Truesdale testified that she has two children with Armstrong, ages 12 and 15, and at the time of the non-jury trial was pregnant with Armstrong's third child.  She acknowledged an on-going relationship with Armstrong since she was 14 years old, although his current wife/girlfriend was Lachelle Griffin.

Truesdale testified that she accompanied Armstrong on his second trip to San Diego where they spent a "romantic getaway weekend."  She did not know when she made the decision to travel to San Diego, but recalled that it was "Greg" who chose San Diego.  Once they arrived in San Diego, Truesdale testified that they took a taxi directly to the Radisson Hotel close to the airport.  Armstrong then left the hotel to rent a car.  Truesdale also testified

10

that while in San Diego they did not meet with anyone.  Armstrong and Truesdale departed San

Diego on December 3, 2004 at 7:30 a.m.

Truesdale testified that Armstrong paid for the hotel, although she was unaware of

how he paid for the hotel charges.  During their trip, Armstrong paid for everything in cash,

including their meals, pedicures,  clothes, "tenners," and a pair of glasses for Truesdale which

cost $376.

Truesdale estimated that on the first day of the trip Armstrong made about ten (10)

phone calls.  She testified that they were together during the entirety of the trip, except for when

Armstrong went to rent the car.

Truesdale testified that Armstrong has always supported their children by giving her

money to cover their expenses.  She reported that he provides her $200 every two weeks for the

children and shops and purchases items for them independently.

In December, Armstrong was driving a Mercedes-Benz, which is the vehicle he

drove to the airport.  She also has seen him driving a Ford F-150 truck, a Lexus, and an

Escalade.

Truesdale confirmed that Greg Armstrong was listed as an authorized user on her

Citibank account.  When she got the credit card bills, Armstrong would split the bill and pay

Truesdale in cash.  In November, Truesdale made a $1700 payment on the Citibank account,

after receiving half of that amount from Armstrong in cash.  The following month, she paid

$500 on the account, again after Armstrong provided half that amount in cash.

Truesdale testified that Armstrong was not working at the time that they traveled to

San Diego, and that she was not aware of any work that he had done after getting out of prison

on his prior drug conviction.

11

E.        Armstrong's Prior Federal Conviction and Supervised Release

United States Probation Officer Donald Covington testified that he has supervised Armstrong since December 1, 2002, for a prior federal conviction for distribution and possession with intent to distribute in excess of fifty grams of crack cocaine.

One of the conditions of Armstrong's supervision is that he is not to leave the jurisdiction without approval.  Officer Covington testified that Armstrong did not seek or obtain permission to travel to San Diego, California in November and December 2004.[7] Another condition of supervision is that Armstrong is required to submit monthly reports which includes information on his current employment, earnings, major expenditures over $500, banking activity, and a listing of all cars owned or used.  Armstrong listed Larry Wallace Construction as his employer in the June - October 2004 reports he submitted to the Probation Office.  *See* Govt. Ex. 11, reports dated July 2004, August 2004, September 2004, and October 2004.[8]  He also disclaimed the use or ownership of any vehicles and did not claim to have made any expenditures over $500.

However, Larry Wallace, the owner of Wallace Construction, testified that Armstrong was not employed by him in June through October, 2004, nor was Armstrong ever employed by him, despite Armstrong having listed Wallace Construction as his employer on the monthly Supervision Reports he filed with the U.S. Probation Office.

_____

[7]        Officer Covington testified that on two prior occasions, Armstrong submitted the necessary paperwork to obtain approval to travel, once to Orlando, FL, in June of 2003 and once to Las Vegas, NV, in September 2003. Both requests were granted.

[8]        Over the objection of counsel for Armstrong, this evidence was introduced by the government to demonstrate the unexplained wealth of Armstrong.

12

F.        Documentary Evidence

        Special Agent Thomas Jackson, with the U.S. Drug Enforcement Agency, testified

with regard to the drugs and cell phones seized, as well as to a number of other documents.

Special Agent Jackson confirmed that in his personal examination, the two packages which

originated from San Diego appeared to be identical in terms of quantity and use of the Doritos

bags.  The manner of shipping was "Priority  Overnight," with Saturday delivery, waiver of

receipt signature, with a shipping cost in excess of $90.00 each.

        1.        Phone Records

        Federal search warrants were obtained to review the contents of the cellular phones

that were recovered from Armstrong and James Jones.  Armstrong's phone number was

determined to be (412) 670-0411.  Armstrong had a feature on his phone known as "Direct

Connect" or "push-to-talk," which functions as an immediate access walkie-talkie system with

other subscribers who have the function.  Armstrong's "push-to-talk" identifier was

136*209097*1.

        James Jones's cellular phone number was (412) 608-5003.  He did not have the

Direct Connect feature on his telephone.

        Special Agent Jackson testified about the "recent call" history obtained from

Armstrong's cell phone.  On December 6, 2004, the day of the delivery of the packages, phone

records indicate that Armstrong made a number of calls, *to wit*:  at 6:46 a.m., he called James

Jones; at 10:54 a.m., he contacted  "Gutchum"[9] using the Direct Connect feature; and at 11:25 a.m., he called Cora Ashley.

Records for Jones's phone for December 6, 2004, reflect an incoming call from Armstrong at 6:39 a.m., a call from Jones to Armstrong at 6:45 a.m.; and contact with Cora Ashley at 10:58 a.m.[10]

Special Agent Jackson testified that from the period of November 24, 2004 through December 6, 2004, there is "steady contact" between Greg Armstrong and James Jones, often with multiple daily contacts.  *See* Govt's Ex. 16.  On December 5, 2004, the day  prior to the delivery of the package, of twelve (12) total calls made on Armstrong's phone, six (6) were with James Jones.  On December 6, 2004, of 11 total calls, two were with James Jones.

Armstrong's records also reflect a number of telephone calls with Cora Ashley from November 26, 2004, through December 6, 2004.  On December 4, 2004, the intended delivery date of the packages, Cora Ashley and Armstrong had phone contact.  On December 6, 2004, the actual day of the delivery of the package, Cora Ashley and Armstrong had numerous contacts:  at 9:11 a.m., Armstrong called Cora Ashley; at 10:21 a.m., Cora Ashley called Armstrong. The record evidence also reflects that additional calls between Armstrong and Cora Ashley occurred at 8:35 a.m. and 8:40 a.m. on December 6, 2004.  *See* Govt's Ex. 16.

---

[9]     "Gutchum" is a nickname for Glenn Payne, formerly of McKeesport, who is Armstrong's first cousin.  Armstrong's phone book contained several numbers for Gutchum, including his Direct Connect number, and a San Diego phone number. Payne is a retired Army veteran who lives and works in San Diego.

[10]    James Jones's cellular phone showed no communication with any California or San Diego phone numbers, nor did he have any numbers in his phone book which correspond to California or San Diego exchanges.

14

From November 24, 2004, to December 4, 2004, Armstrong's telephone records show that 29 of his 31 Direct Connect sessions were with Glenn Payne in San Diego. Armstrong and Payne had several toll phone communications during this period as well. *See* Govt's Ex. 16.

Glenn Payne's phone records demonstrate that of 30 Direct Contact sessions between November 10, 2004, and December 6, 2004, all 30 sessions were with Gregory Armstrong. Interestingly, on December 6, 2004, there were contacts at 7:53 a.m. and 7:54 a.m., Pacific Mountain Time, which would have been 10:53 a.m. and 10:54 a.m. Eastern Time.  On December 4, 2004, the intended delivery date of the packages, Payne and Armstrong had four Direct Connect sessions reflected on Payne's records, and four also on December 3, 2004, the day the packages were shipped from San Diego.


2.    *Travel records*

Special Agent Jackson also obtained records from US Airways and Travelocity that confirm two separate trips by Armstrong to San Diego from Pittsburgh in late November and early December 2004.  Armstrong's first trip to San Diego occurred on November 18, 2004, and originally he was scheduled to return to Pittsburgh on November 23, 2004.  Armstrong utilized Travelocity for this ticket and charged $365.30 to his Capital One MasterCard.

Armstrong never used the original return leg of the ticket on November 23, 2004, but rather purchased a first-class ticket for $709.10 and returned from San Diego to Pittsburgh on November 24, 2004.  The credit card used for the first class ticket was a Citibank MasterCard, in the account name of Sharese Truesdale, at 1315 Maple Street, McKeesport, PA.

15

Records also indicate that from San Diego, CA, Armstrong purchased an airline ticket for James Jones to travel to San Diego from Pittsburgh on November 20, 2004. Armstrong charged this ticket, in the amount of $864.70, to his Visa credit card.  Both Jones and Armstrong returned to Pittsburgh on the same flight, on November 24, 2004, although Jones did not sit in first class.

On November 29, 2004, Armstrong charged a second airline ticket to his Visa credit in the amount of $708.70.  Armstrong left Pittsburgh for San Diego on November 30, 2004, and returned to Pittsburgh on December 3, 2004.  *See* Govt Exhibit 16, 27.


3.     *Citibank MasterCard Records*

Agent Jackson also obtained Citibank records in which the actual account holder is listed as "Sharese N. Truesdale," but Gregory Armstrong was an authorized user on the account.  The mailing address on the account through December 2004, was 1315 Maple Street, McKeesport, PA.

In addition to the first-class ticket purchased by Armstrong on November 21, 2004, on the account, Armstrong also made charges on November 26, 2004 and December 3, 2004 at Enterprise Rent-A-Car in San Diego, for $144.92 and $177.24, respectively.

At trial, counsel entered into the following stipulation with respect to the Citibank Records:  Gina Steineke, Subpoena Compliance Officer with Citibank Corporation, would testify that computer records indicate that Gregory Armstrong was an authorized user on the account of Sharese Truesdale with his own credit card.  Sharese Truesdale contacted Citibank on December 15, 2004, to remove Gregory Armstrong from her account.  The billing address

16

for Sharese Truesdale was 1315 Maple Street, McKeesport, PA, 15132, until December 2004, when her billing address was changed to 1304 Sumac Street, McKeesport, PA 15131.


   4.    *Enterprise Rent-A-Car*

   Two separate car rental agreements from the San Diego airport Enterprise Rent-A-Car by Armstrong were admitted at trial. The records indicate that Armstrong picked up a car on November 22, 2004 at 7:51 a.m. and returned it on November 24, 2004 at 8:00 a.m. *See* Exhibit 14. On that agreement, James Jones is listed as an authorized driver.

   The second rental agreement indicates that Armstrong picked up a car at 8:02 a.m. on December 1, 2004. No other drivers were authorized. The car was returned at 10:10 a.m. on December 3, 2004. The mileage at time of pickup was 11,025 and 11,113 at drop off.


   5.    *Federal Express Records*

   Records from Federal Express reflect that both Package 1 and Package 2 were sent on December 3, 2004. Package 1 was first logged in to the Federal Express system at 9:53 a.m. and Package 2 was first logged into the Federal Express system at 10:21 a.m. Both were mailed from San Diego locations, priority overnight, signature waived, with no phone numbers provided for the intended recipients, at a cost in excess of $90.00 each. The shipping charges for both packages were paid in cash.


G.    <u>Stipulations</u>

17

Prior to the close of trial, counsel agreed to the following stipulations, in addition to the information which pertained to Sharese Truesdale's Citibank account:

1.       The contents of Exhibit #1, Package 1, originally contained in twenty separate bags, which was the package addressed to 1716 Sumac Street, were analyzed at the DEA Northeastern laboratory and found to contain:  4.9 kilograms of cocaine hydrochloride, a Schedule II controlled substance, with a purity concentration of 82%.

2.       The contents of Exhibit #2, Package 2, originally contained in twenty-four separate bags, which was the package  addressed to 1315 Maple Street, were analyzed at the DEA Northeastern laboratory and found to contain:  5.963 kilograms of cocaine hydrochloride, a Schedule II controlled substance, with a purity concentration of 87%.

3.       Kathy Dial, Director of Consumer Affairs at the Frito Lay Company, would testify that all of the Doritos bags contained in Exhibits #1 and #2, which bore similar dates and lot numbers, were manufactured at the Ranco Cucamonga, CA facility.  After manufacture, the Doritos packages would have either been sent to distribution centers either in San Diego or to several other distribution centers in the Southern California area.

## CONCLUSIONS OF LAW

In order to establish the existence of a conspiracy, the government must prove that such an agreement existed between two or more people, that the defendant knew the purpose of that agreement, and that the defendant deliberately joined the agreement with the intent to further its unlawful purpose. *See United States v. Mastrangelo*, 172 F.3d 288, 291 (3d Cir. 1998).  "This proof incorporates a demonstration that a defendant has 'knowledge of the illegal

18

objective contemplated by the conspiracy." ' *Id.* (*quoting United States v. Wexler*, 838 F.2d 88, 91 (3d Cir. 1988)).

The Court finds and rules that while there is no direct evidence of an agreement between Armstrong and James Jones, and others, overwhelming circumstantial evidence does exist by which the Court finds Armstrong guilty of the crimes charged against him in the Indictment, *to wit:* conspiracy with James Jones and others to distribute and possess with intent to distribute 5 kilograms or more of cocaine; and, attempt to possess with intent to distribute 5 kilograms or more of cocaine.

A.     Proof of Conspiracy

The Court finds and rules that the circumstantial evidence, evidence of associations, behavior and contacts, proves a conspiracy between Armstrong, James Jones, and others to possess the shipments of cocaine from San Diego with intent to distribute.

First, ample evidence establishes a common association and relationship between James Jones and Armstrong. The evidence of record demonstrates that they acted in concert on December 6, 2004, and that they acted in concert in the days preceding the delivery of the cocaine by traveling together to the source city of the cocaine, San Diego.

The evidence demonstrates that Armstrong traveled to San Diego on November 18, 2004.  Once there, he purchased a ticket for Jones to join him in San Diego on November 21, 2004.   The same day, Armstrong purchased a one-way first-class ticket return to Pittsburgh for an additional $709.10.  Armstrong rented a car on November 22, 2004, and listed James Jones as an authorized driver.  They returned on the same flight from San Diego to Pittsburgh on November 24, 2004.

Evidence of the conspiracy between Armstrong and Jones is further documented through the phone records which demonstrate constant phone contact in the days preceding the delivery, the day of the delivery, and their actions on the day of the delivery.[11]  On December 6, 2004, Armstrong and Jones not only communicated with each other, they were together in the crucial minutes prior to Jones' pick up of Package 1.

Armstrong drove past 1716 Sumac with Jones at approximately 11:02 a.m., less than twenty (20) minutes after the delivery of the package.  Within seven (7) minutes of the drive-by, Jones left Armstrong's house, retrieved the package, and immediately drove to the rear of Armstrong's house.

The Court further finds and rules that evidence of a conspiracy is also established through Armstrong's associations and concert of action with Cora Ashley.  For example, Armstrong was driving the Ford F-150 that was registered to Cora Ashley; Armstrong told Trooper Lieberum that he had purchased 1717 Sumac Street, Cora Ashley's home, for nearly $30,000; and Armstrong and Cora Ashley had nearly daily phone contact in the days preceding the delivery of Package 1.[12]

Also, the evidence reflects that Cora Ashley called Jones at 10:58 a.m.,  immediately before he and Armstrong were seen together in the truck.  Immediately after Jones and

---

[11]     On November 25, the day after they returned from San Diego, Armstrong and Jones talked four (4) times; on November 26, they talked seven (7) times; on November 27, they talked five (5) times; and on November 28, they talked four (4) times. They continued to have daily telephone contact up through and including December 6, 2004, at 6:39 a.m. and 6:45 a.m.  *See* Govt Ex. 16.

[12]     Phone records indicate that Armstrong and Cora Ashley made several calls to each other on November 26, November 27, November 29, November 30, and through December 6, 2004.   Significantly, on December 6, 2004, there are contacts between Armstrong and Cora Ashley at 9:11 a.m., 10:21 a.m., and twice after 11:00 a.m.

Armstrong drove past 1716 Sumac, Cora Ashley was seen by the police walking across the street to stand at 1716 Sumac until James Jones was able to return to pick up the package.

For all these reasons, the Court finds that on December 6, 2004, Cora Ashley acted in concert with Jones and Armstrong in their retrieval of Package 1.

Moreover, evidence of the conspiracy is established from Armstrong's close association and contact with the source city of the cocaine, San Diego.  Armstrong had continued phone contact with Glenn Payne, a/k/a Gutchum, in San Diego.  The record evidence reflects that Armstrong had 58 separate Direct Connect sessions with Payne from November, 2004,  up to and including December 6, 2004.  Armstrong and Payne also had a number of toll calls in the days preceding the delivery, including on December 2, 3, and 4, the intended date of delivery of the packages.  On December 6, 2004, Armstrong and Payne talked at 10:53 a.m. and 10:54 a.m.  At that time, Package 1 was visible from the porch, but had not yet been retrieved.

Armstrong made two separate trips to San Diego in the weeks preceding the delivery of the cocaine.

It also can not be ignored that certain unattributable acts were clearly conducted in furtherance of the conspiracy.  There was a note was placed on the door at 1716 Sumac Street, which directed Federal Express to leave the package on the porch.   The note reflects that someone obviously was anticipating the delivery and, further, lends credence to the government's argument that Armstrong deliberately drove past 1716 Sumac in a slow fashion in an attempt to determine if the package had been delivered.

B.      Proof of Knowledge and Opportunity

21

The evidence of Armstrong's associations to both packages and proximity to Package 1 also provides evidence of Armstrong's knowledge of the contents. Within minutes of Package 1 being delivered, and Cora Ashley calling Jones, Armstrong and Jones are seen driving by 1716 Sumac Street and Armstrong is seen looking over his shoulder at the porch. After Jones retrieved the package, he took it to an area immediately behind the home of Armstrong.

Further, there is overwhelming evidence that Armstrong was very familiar with the destinations of both Packages 1 and 2: 1716 Sumac Street and 1315 Maple Street, respectively. With respect to 1716 Sumac Street, Armstrong had toured the house in September 2004 and he knew that it was vacant. He made an offer to purchase it, as well as an offer to purchase Trooper Lieberum's house. He claimed to have purchased 1717 Sumac, Cora Ashley's house, immediately across the street from 1716 Sumac. Armstrong was extremely familiar with the block and the occupants in the immediate proximity to 1716 Sumac.

The evidence also demonstrates that Armstrong had a strong connection to 1315 Maple Street. Sharese Truesdale, the mother of two of his children, lived at that location for three years. Armstrong had been in the home, visited it often, and knew that Sharese Truesdale had moved out of that home sometime before December 6, 2004.

Moreover, Armstrong's prior conviction also proves knowledge. *See United States v. Givan*, 320 F.3d 452, 461 (3d Cir. 2001) (evidence of such a prior conviction makes knowledge of the presence of illegal drugs "more probable than it would have been without the evidence as it indicates that [Givan] had knowledge of drugs and drug distribution, and that it was less likely that he was simply in the wrong place at the wrong time.")

The Court further finds that Armstrong's status of being on supervised release created a strong incentive for him to conceal his travel to San Diego from his Probation Officer. By failing to request permission to travel to San Diego, Armstrong was not subjected to the scrutiny of the Probation Office.

Lastly, Armstrong's travel to San Diego in the days preceding the shipment of Packages 1 and 2 also creates an inference of knowledge and demonstrates the opportunity to be involved in the packaging and shipping of the two boxes. Armstrong's departure from San Diego on the day of the shipment of the boxes, December 3, 2004, taken together with the other evidence of record, is compelling evidence of his participation in the conspiracy.

### C.    Leadership and Command Structure

The government also presented strong evidence that Armstrong was the leader of the conspiracy, not "merely present" at the scene of the criminal activity as he contends.  From the evidence adduced at trial, the Court concludes that Armstrong controlled the concerted action leading up to the delivery of the packages.   Armstrong traveled to San Diego on November 18, 2004, and from there, he purchased a ticket for James Jones.  On the return trip, Armstrong traveled first class, while Jones traveled coach, but on the same flight.

Armstrong made the arrangements for the rental car and listed James Jones as an authorized driver.  Armstrong returned to San Diego and came back to Pittsburgh contemporaneously with the shipment of the packages.

Armstrong was the exclusive communication link to San Diego - the evidence demonstrates that he alone had daily contacts with Glenn Payne in San Diego.

23

On the day of their arrest, Armstrong had in excess of two thousand dollars on his person.  Jones had just over $130.

Lastly, it can not be ignored that James Jones retrieved Package 1and brought it to the rear of Armstrong's house leaving it in the car trunk.

      D.     <u>Unexplained Wealth and Lack of Legitimate Income</u>

Evidence at trial demonstrated a lack of legitimate income for Armstrong; yet, Armstrong drove expensive cars and made lavish expenditures, including traveling to San Diego.   Testimony and evidence at trial was that Armstrong drove a Mercedes-Benz, Lexus, and Cadillac Escalade, as well as the Ford F-150. He spent thousands of dollars on plane travel, car rentals, and purchases in the two-week period preceding the delivery of the packages, and made cash payments to Sharese Truesdale for the Citibank account and for support of their children.  Yet, the testimony was undisputed that Armstrong has not been legitimately employed since he was released from prison.

      E.     <u>Armstrong's Travel to San Diego</u>

Armstrong's two trips to San Diego bear striking similarities:  on both occasions, he reserved his ticket the day prior to travel; he rented a car from Enterprise Rent-A-Car, on the account of Sharese Truesdale; and he maintained almost daily telephone contact with Glenn Payne, James Jones, and Cora Ashley.

**CONCLUSION**

24

Given the totality of the circumstances in this case, the Court finds and rules that the government has proven beyond a reasonable doubt that Gregory Armstrong was an active participant in the conspiracy to possess with intent to distribute in excess of five (5) kilograms of cocaine.   The evidence presented by the government clearly establishes that Armstrong was the central character of the alleged conspiracy.

For all of the foregoing reasons, the Court finds and rules that Defendant, Gregory Armstrong, is guilty as charged in the indictment of one count of conspiracy to distribute and possess with intent to distribute five (5) kilograms or more of cocaine, in violation of Title 21, United States Code, section 846; and one count of attempt to possess with intent to distribute five (5) kilograms or more of cocaine, in violation of  Title 21, United States Code, section 846.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    )
                                    )
                v.                  )       02: 04cr0313
                                      )
GREGORY ARMSTRONG          )

## ORDER OF COURT

AND NOW, this 8th day of February, 2006, after a non-jury trial conducted on October 13 and 14, 2005, and in accordance with the foregoing Memorandum Opinion, the Court finds the Defendant, Gregory Armstrong, **GUILTY** as charged in the indictment of one count of conspiracy to distribute and possess with intent to distribute five (5) kilograms or more of cocaine, in violation of Title 21, United States Code, section 846; and one count of attempt to possess with intent to distribute five (5) kilograms or more of cocaine, in violation of  Title 21, United States Code, section 846.

It is further **ORDERED** that sentencing of Defendant is scheduled on **May 12, 2006, at 10:00 a.m.**

The United States Probation Office is hereby **ORDERED** to conduct a presentence investigation and prepare a Presentence Investigation Report in accordance with Local Criminal Rule 32.1.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:       Soo C. Song,
            Assistant U.S. Attorney
            Email: soo.song@usdoj.gov

            Gary B. Zimmerman, Esquire
            Email: garybzim@aol.com

            U.S. Probation Office

            U.S. Marshal